# EXHIBIT A

Filing # 107483981 E-Filed 05/14/2020 02:06:29 PM

## IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
## IN AND FOR SARASOTA COUNTY, FLORIDA

**FRANCIS KRAMER** and **CHRISTINE KRAMER**

      Plaintiffs,

v.                                    **CASE NO.**

**STANTEC CONSULTING SERVICES INC.**,
a foreign corporation

      Defendant.

_____/

## COMPLAINT

Plaintiffs, **FRANCIS KRAMER** and **CHRISTINE KRAMER** (collectively, "Plaintiffs" or the "Kramers") sue Defendant, **STANTEC CONSULTING SERVICES INC.**, a foreign corporation ("Defendant" or "Stantec") and state as follows:

1.      This is an action for negligence with damages in excess of the jurisdictional requirement of this Court, exclusive of attorney's fees and costs.

2.      Plaintiffs are individuals residing in Sarasota County, Florida.

3.      Defendant is a foreign corporation doing business in Sarasota County, Florida.

4.      Venue is proper because the cause of action accrued in Sarasota County, Florida.

5.      All conditions precedent to this action have occurred, have been satisfied, or have been waived.

6.      The Kramers own and reside at the property located at 5428 Siesta Cove Drive, Sarasota (the "Property"), a 6-year old home on Siesta Key.

7.      In or around 2016, Sarasota County embarked on a multi-year phased plan to decommission the Siesta Key Utility Authority and pump wastewater to the mainland for treatment at one of two regional facilities rather than to a treatment plant on Siesta Key.

1

8.      As part of this project, in or around April 2016, Sarasota County contracted for the performance of construction services related to force main and water main work as part of the Siesta Key Main phase I and Water Main, ICW Crossing to U.S. 41 Profit, Bid No. 153159CS and Contract No. 2016-258, in Sarasota County, Florida.

9.      A portion of the work would proceed on a 15-foot utility easement along the south end of the Property.

10.     Stantec, as engineer of record for the project, prepared all project drawings for the project and called for a bore drilling method to accomplish the project.

11.     In addition to preparing all project plans, Stantec reviewed various contractors submitting bids for the construction work and ultimately approved of **SOUTHERN UNDERGROUND INDUSTRIES, INC.,** ("Southern Underground"), the contractor hired to perform the phase I construction on the Property.

12.     Further, Stantec provided monitoring services for the project and, while not the general contractor, it oversaw all engineering aspects of the project and directed the general contractor's actions in that regard.

13.     In accordance with Stantec's project drawings, Southern Underground performed horizontal directional drilling on a 15-foot utility easement on the south end of the Property.

14.     The original plan, as conveyed to the Kramers, was to drill from Phillippi Estates on the mainland and to drill in the 15 ft easement alongside the Kramer property and exit in the cul-de-sac. Stantec at some point changed those plans and decided to drill from the Siesta Key side.

15.     Stantec, concerned about damaging the residence, took an additional safety precaution of calling for 28-inch casings alongside the Property's garage to protect the structure during the boring.

16.     At Stantec's request, Southern Underground began drilling as much as twelve hours per day, five days per week.

17.     When installing one casing, Southern Underground ran into what they deemed an obstruction. At Stantec's request, Southern Underground continued turning the casing for two days attempting to quickly proceed through construction.

18.     During the installation of the casing, the Kramers complained of extreme vibration in the Property to Stantec. Stantec minimized and disregarded the Kramers' concerns.

19.     After the end of the second day installing the casing, a wall on the Property adjacent to the garage sustained a vertical drop such that a significant crack formed.

20.     Stantec determined that, due to the continued drilling directed by Stantec, a casing weld had broken alongside the Property's garage.

21.     After a temporary stoppage in work, Stantec ordered that the work resume, without any modification to the plans that were evidently causing damage to the Property.

22.     When the work resumed, Stantec's plans called for a soil separator. This piece of equipment ran at a low frequency and a very high sound pressure level resulting in severe vibrations and excessively loud noise emanating to the Property.

23.     Although a reasonable engineer would have made plans for noise abatement, Stantec made no such plans despite the soil separator emitting noise levels far exceeding the maximum levels provided for in County noise level ordinances.

24.    The Kramers, again, complained about the noise and severe vibrations which shook the Property the entire time work progressed.

25.    Even after Stantec received complaints from the Kramers regarding the noise levels and severe vibrations, Stantec still made no attempt at assessing the problem or analyzing alternative methods to complete the project as a reasonable engineer would have. Instead, Stantec again minimized the Kramers' concerns and directed that the project continue. Stantec made no meaningful attempt at noise abatement either.

26.    Instead, the soil separator ran virtually non-stop for five days per week over the next nine to ten months in front of the Property, rattling the Property's walls and surfaces all the while.

27.    At a certain point, the vibrations were so severe that the Kramers' front door, composed, in part, of hurricane impact glass, cracked and oozed the polymer holding together the windowpanes.

28.    When foundational cracks began forming around the six-year-old Property, the Kramers showed Stantec the damages already sustained and asked them to consider alternatives to the horizontal directional drilling called for by Stantec's plans, which was destroying their Property.

29.    Although Stantec acknowledged the problem, it, again, ignored the Kramers and directed that drilling continue.

30.    Stantec's negligence resulted in additional damages to the Property, including but not limited to the following: cracks in the garage began oozing a clay-like residue; the floor of the Property became bouncy; and, after four months of vibrations, a chandelier in the foyer came crashing down after the hook holding it up failed under the constant vibration.

31.     Stantec, in preparing project drawings for construction on an easement across the Kramer's Property and monitoring such construction, owed a duty to the Kramers.

32.     Stantec breached such duty by negligently preparing project drawings such that the work performed in accordance with such drawings caused the Property to sustain structural cracks and other damage, including a shift in the Property's interior floor elevation.

33.     Additionally, Stantec breached such duty as a result of its negligence in monitoring the progression of the project. A reasonable engineer of record would have assessed the damages and determined an alternative to the destruction of private property.

34.     As a direct and proximate result of Stantec's negligence, the Kramers sustained damages including but not limited to damages for repair.

35.     Additionally, even fully repaired, the Property has lost substantial value because of the structural damages cause by Stantec's negligent engineering work.

WHEREFORE, the Kramers request this Court issue judgment against Stantec for damages and provide any such other and further relief as this Court deems just and proper.

**BENTLEY & BRUNING, P.A**.

*Brian D. Goodrich /s/*
_____
MORGAN R. BENTLEY, ESQ.
Florida Bar No. 0962287
mbentley@bentleyandbruning.com
**BRIAN D. GOODRICH, ESQ.**
Florida Bar No. 0106948
bgoodrich@bentleyandbruning.com
783 South Orange Avenue
Suite 300
Sarasota, Florida 34236
Phone: 941-556-9030
Facsimile: 941-312-5316
Attorneys for Plaintiffs
Secondary: jbradley@bentleyandbruning.com